# SHER TREMONTE LLP

February 2, 2026

**BY ECF**

The Honorable José R. Almonte
United States Magistrate Judge
District of New Jersey
50 Walnut Street
Newark, New Jersey 07101

> **Re:** *United States v. Thomas-Kaan Jimenez-Guzel[1]*
> **Case No. 2:25-mj-11260**

Dear Magistrate Judge Almonte:

We write on behalf of Tomaskaan Jimenez-Guzel to respectfully request that, for the reasons set forth below, the Court release Tomaskaan from custody on a substantial bond and under strict conditions sufficient to ameliorate any danger to the community and ensure his appearance in court.

Tomaskaan is a 19-year-old U.S. citizen with no criminal history, no history of violent conduct, strong and supportive family relationships, and an extensive history of traumatic brain injuries. He was arrested on November 4, 2025, and has been detained, on consent and without prejudice to a future bail application, in the Solitary Housing Unit ("SHU") at Essex County Correctional Facility ("Essex"). The allegations in the complaint are serious: that over a six-month period from June to November 2025, he spiraled down an Internet rabbit hole of ISIS propaganda videos and social media chats, culminating, the complaint alleges, in travel plans to Turkey in order to eventually join ISIS. For purposes of the Court's consideration as to whether Tomaskaan can safely be released on bail, however, it is important to note that there is no allegation that Tomaskaan ever planned to take any violent action within the United States. Instead, the Pretrial report and Tomaskaan's history show him to be a young person with deep family and community roots, a good student, a responsible son and brother, and a person who can be trusted by the Court to comply with all conditions, particularly given how much his family has already suffered following his arrest and how loathe he would be to place his family and those who support him in any further jeopardy. To say he was a misguided, immature teenager is not to minimize the seriousness of the allegations but to make clear to the Court that he had no intention of ever hurting anyone, and that he has never in fact hurt anyone.

---

[1] Mr. Jimenez-Guzel's first name is properly spelled Tomaskaan, rather than "Thomas-kaan" as used in the complaint.

Hon. Magistrate Judge Almonte
February 2, 2026
Page 2

Attached for the Court's consideration are: List of Proposed Suretors (Exhibit A, confidential material); Parents for Peace Summary of Services (Exhibit B); Letters of Support from family members and friends (Exhibit C, confidential material); and, My Steps Consulting Services Summary (Exhibit D).

## I.      PROPOSED CONDITIONS OF RELEASE

We request that the Court release Tomaskaan on a $500,000 bond, co-signed by five financially responsible suretors: his mother, father, older brother and two close friends of the family. Tomaskaan would live with his father in Maryland, out of the environment in which he is alleged to have become first isolated and then interested in ISIS and its radical propaganda. His father would serve as a third-party custodian, *see* 18 U.S.C. § 3142(c)(B)(i), which would legally obligate him to assume supervision of Tomaskaan and immediately report any violations of a release condition to the Court. Tomaskaan's father is a recently retired international development lawyer, a U.S. citizen, a practicing Catholic, and an extremely law-abiding person who will not tolerate any noncompliance by his son. In addition, Tomaskaan's mother, a policy advisor to the United Nations on gender equity, who is very close to her son, is willing to move from New Jersey to Maryland so that she can be nearby to offer consistent emotional support. Tomaskaan's older brother also lives nearby in Washington D.C. and will be an active participant in Tomaskaan's release conditions. If released, Tomaskaan would be on home detention with GPS monitoring, with monitored internet access, and with mandatory mental health and neurological treatment. In addition, the entire family is committed to working with a disengagement organization described below and in Exhibit B, Parents for Peace, to disengage Tomaskaan from radical propaganda and ideology. Finally, Tomaskaan's mentor, a coach who worked intensively with Tomaskaan to prepare him for college football before a major concussion forced Tomaskaan to medically retire in 2023, and who has worked with hundreds of adolescents on life readiness and executive skills through his professional consulting firm for adolescent athletes, is committed to working with Tomaskaan if he is released. *See* Exhibit D, Order My Steps Consulting. They have a strong relationship of trust and good communication, which will assist Tomaskaan in his reentry.

A full list of the proposed suretors, with details concerning their relationships to Tomaskaan, their professional backgrounds and their financial situations, is enclosed as Exhibit A.

Along with the standard conditions, we propose Tomaskaan be released with the following additional, strict conditions:

1. The defendant's father, Javier Jimenez, is to serve as a third party custodian;
2. The defendant is to live with his father in Maryland;
3. The defendant will be on home detention with GPS location monitoring;
4. The defendant may not knowingly have contact with individuals or organizations that are affiliated with foreign terrorist organizations, or individuals or groups that promote violence for the purpose of effecting political change;

Hon. Magistrate Judge Almonte
February 2, 2026
Page 3

> 5. The defendant may not possess a firearm or any other instrument or materials designed to be used as a lethal weapon;
> 6. The defendant shall not attempt to acquire a passport or any other travel document;
> 7. The defendant will be subject to random home and community contacts by Pretrial Services;
> 8. The defendant must undergo mental health evaluation and/or treatment as directed by Pretrial Services;
> 9. The defendant must undergo neurological evaluation and/or treatment as directed by Pretrial Services;
> 10. The defendant must participate in a program administered by Parents for Peace, or another suitable program as directed by Pretrial Services; and,
> 11. The defendant may have access to only one Internet-enabled electronic device, which will be monitored by Pretrial Services, and he may not access social media.

These conditions are sufficient to reasonably assure the safety of the community and Tomaskaan's appearance in Court.

With respect to Proposed Condition #10, in October 2019, the U.S. Department of Justice directed United States Attorneys' Offices to create programs to develop alternative strategies to address terrorism and extremist threats in addition to or in lieu of traditional law enforcement remedies, where appropriate. Parents for Peace is a highly-regarded not-for-profit organization that has been providing services to meet this need in cases involving extremism and is partially funded by the U.S. Department of Homeland Security's Targeted Violence and Terrorism Prevention (TVTP) grant program. *See* Exhibit B, Parents for Peace Summary of Services. It is an alliance of parents of extremists, former extremists, survivors of extremism, researchers, and clinicians with significant experience with, and dedication to, compassionate de-recidivism work in terrorism cases. Over the past seven years, Parents for Peace has assisted with hundreds of cases—successfully guiding the off-ramping and rehabilitation of individuals indoctrinated in a wide variety of extremist ideologies. They take a holistic approach, beginning with an intensive assessment process, family interviews, review of case documents, and conversations with Pretrial or Probation, in order to formulate an individualized plan, including weekly sessions with a mental health professional and other Parents for Peace staff. *Id.* In addition to working with extremists, they have extensive experience working with family members of extremists on how to aid in and supervise de-recidivism efforts. *Id.* Parents of Peace has reviewed Tomaskaan's case and stated they are willing to work with him intensively if he is placed on pretrial supervision.

## II.     BAIL REFORM ACT

As the Supreme Court held in *United States v. Salerno*, "In our society, liberty is the norm, and detention prior to trial . . . is the carefully limited exception." 481 U.S. 739, 755 (1987). This presumption of release is encapsulated in the Bail Reform Act. *See* 18 U.S.C. § 3142. The legal principles are familiar. The Court "shall order" release except in certain narrow circumstances where the Court finds that "no condition or combination of conditions would *reasonably assure* the appearance of the person as required and the safety of any other person and the community." *Compare* 18 U.S.C. § 3142(c) *with* § 3142(e). Under this statutory scheme, "it is only a 'limited

Hon. Magistrate Judge Almonte
February 2, 2026
Page 4

group of offenders' who should be detained pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225, at 7 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3189); *see also United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992) ("There can be no doubt that this Act clearly favors nondetention.").

### A.  The Rebuttable Presumption Is A Low Bar

Here, the statute charged in the complaint creates a *rebuttable* presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." § 3142(e)(3). The presumption inquiry proceeds in two steps. At Step 1, the Court must consider whether the defense has met the low burden of production to rebut the presumption. Tomaskaan's youth, lack of criminal history, lack of history of violence, family support, his neurological condition, and the proposed bond conditions are sufficient to rebut the presumption. At Step 2, the Court must consider the presumption alongside all of the other Section 3142(g) factors—even if the presumption has not been rebutted. Release is warranted in this case because there are numerous facts under Section 3142(g) that both rebut the presumption of detention and demonstrate that there are conditions of release that will reasonably assure both Tomaskaan's appearance in court and the safety of the community.

The Bail Reform Act imposes two checks on the presumption: (1) there is an easy-to-meet standard for rebutting the presumption and the prosecution always bears the burden of persuasion, and (2) the presumption alone does not warrant detention and must always be weighed along with other factors in § 3142(g).[2] Moreover, it is impermissible to detain a defendant in a presumption case based solely on the nature of the crime charged or the weight of the evidence.

To rebut the presumption, a defendant simply needs to produce "*some credible evidence . . . that he will appear and will not pose a threat to the community*" upon his release. *United States v. Carbone*, 793 F.2d 559, 560 (3d Cir. 1986) (citing *United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985), *abrogated on other grounds by United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990) ("[T]o rebut the presumption, the defendant must produce some evidence."). *See also United States v. Gamble*, No. 20-3009, 2020 U.S. App. LEXIS 11558 at *1–2 (D.C. Cir. Apr. 10, 2020) (holding that "[t]he district court erred in concluding that appellant failed to meet his burden of production to rebut the statutory presumption" regarding dangerousness because "appellant did 'offer some credible evidence contrary to the statutory presumption,'" including information that he had a job offer) (unpublished) (quoting *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985)); *United States v. Wilks*, 15 F.4th 842, 846–47 (7th Cir. 2021) (explaining that the defense bears "a light burden of production" to rebut the presumption, "but the burden of persuasion always rests with the government"). Indeed, the presumption of detention is rebutted by "*[a]ny evidence* favorable to a defendant that comes within a category listed in § 3142(g) . . . including

---

[2] *See, e.g.*, Alison Siegler, *Freedom Denied: How the Culture of Detention Created a Federal Jailing Crisis* 151 (2022), https://freedomdenied.law.uchicago.edu/.

Hon. Magistrate Judge Almonte
February 2, 2026
Page 5

evidence of their marital, family and employment status, ties to and role in the community . . . and other types of evidence encompassed in § 3142(g)(3)." *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) (emphasis added). *See also United States v. Chagra*, 850 F. Supp. 354, 358 (W.D. Pa. 1994) (In this jurisdiction "a defendant may rebut the presumption through 'testimony by co-workers, neighbors, family, physician, friends, or associates concerning the arrestee's character, health or family situation.' " *Id.* (quoting *United States v. Suppa,* 799 F.2d 115, 120 (3d Cir.1986)).

In analogous cases, courts have found the presumption to be rebutted by the combination of a lack of history of violence or criminal conduct, strong family ties, a lack of serious mental health issues, strong suretors, and strict bail conditions. *See, e.g., United States v. Mattis and Rahman*, 963 F.3d 285, 293 (2d Cir. 2020) (lawyers charged with attempted firebombing of NYPD vehicle on public street and facing 30-year mandatory minimum sentence); *United States v. Halima Salman*, 24 Cr. 206 (NCM) (E.D.N.Y.) (defendant charged with receiving military-style arms training from ISIS); *United States v. Hashimi et al.*, 22 Cr. 553 (ENV) (E.D.N.Y.) (defendant charged with conspiring to provide material support to ISIS); *United States v. Delowar Hossain*, 19 Cr. 606 (SHS) (S.D.N.Y.) (defendant charged with providing material support to Al Qaeda).

### B. The Presumption Alone is Not Sufficient to Warrant Detention and Must be Weighed Along With the § 3142(g) Factors

Once the presumption is rebutted, the Court must weigh the presumption against all of the other evidence about the defendant's history and characteristics. "Once a defendant has met his burden of production . . . the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court. Even in a presumption case, the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community." *Mattis*, 963 F.3d. at 290–9*; see also Jessup*, 757 F.2d at 384 (holding that the judge should consider the rebutted presumption along with the § 3142(g) factors); *Chagra*, 850 F.Supp. at 358 (the presumption once rebutted does not disappear, but "remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to the factors listed in § 1342(g).") (quoting *Dominguez,* 783 F.2d at 707). The Court should not give the presumption undue weight if evidence relating to other § 3142(g) factors supports release.

In evaluating which conditions should be imposed that are the least restrictive, the Court looks to the following factors:

(1) the nature and circumstances of the crime charged;

(2) the weight of the evidence against the defendant;

(3) the history and characteristics of the person, including--

Hon. Magistrate Judge Almonte
February 2, 2026
Page 6

> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

> (4) the nature and seriousness of the danger to the community or to an individual that would be posed by release.

18 U.S.C. § 3142(g).

### C. Forbidden Considerations in a Presumption Case

A judge may not detain a defendant in a presumption case based solely on: (1) an unrebutted presumption alone, (2) evidence of the defendant's past dangerousness, (3) the nature and seriousness of the crime charged, or (4) the weight of the evidence of the person's guilt.

First, the defendant never bears the burden of persuasion—even if the presumption is unrebutted. It is not incumbent on the defendant to persuade the judge that there exist conditions of release that will reasonably assure the safety of the community. That burden of persuasion lies with the government, the standard of which is always clear and convincing evidence. *Wilks*, 15 F.4th at 846–47 ("[T]he burden of persuasion always rests with the government and an unrebutted presumption is not, by itself, an adequate reason to order detention.").

Second, even if the presumption is not rebutted, a judge is prohibited from detaining a defendant "based on evidence that he has been a danger in the past[.]" *Dominguez*, 783 F.2d at 707. Instead, past dangerous conduct is relevant only to the extent that the government can prove—by clear and convincing evidence—that the defendant is "likely to continue to engage in criminal conduct undeterred [ ] by . . . release conditions." *Id.* Even when a defendant is charged with a serious crime, there are often release conditions that will reasonably assure the safety of the community.

Third, to rebut the presumption of dangerousness, a defendant need not "demonstrate that narcotics trafficking [or another serious crime] is not dangerous to the community." *Id.* at 706. Instead, this Court must analyze the defendant's individual characteristics under § 3142(g).

Fourth, the Court is forbidden from relying solely on the weight of the evidence of guilt to detain a defendant in a presumption case. A defendant is not required to "'rebut' the government's showing of probable cause to believe that he is guilty of the crimes charged." *Id.* The likelihood of a conviction is analytically distinct from whether there are conditions of release that will reasonably assure the person's appearance or the safety of the community.

Hon. Magistrate Judge Almonte
February 2, 2026
Page 7

### III. THERE ARE CONDITIONS THAT WILL REASONABLY ASSURE APPEARANCE AND SAFETY IN THE PARTICULAR CIRCUMSTANCES OF THIS CASE

Detention determinations are by their very nature fact-bound assessments that must be based on the evidence pertaining to the particular defendant before the court. *United States v. Traitz,* 807 F.2d 322, 325 (3d Cir.1986) ("Each case, of course, is *sui generis,* and must be decided on the basis of the particular record adduced."). Here, there is much more than "some evidence that [Tomaskaan] will not flee or endanger the community if released." *Dominguez*, 783 F.2d at 707. This Court should give the presumption of detention "the low weight to which it is assigned by case law."[3] Tomaskaan's strong ties to the United States and his family, his lack of any prior criminal or violent history, and the proposed bond and conditions of release rebut the presumption in this case and reasonably assure his appearance in court and the safety of the community.

#### A. The Nature and Circumstances of the Crime Charged

The allegations in the Complaint are serious and frightening. But the circumstances of Tomaskaan's life at the time of the events described in the Complaint provide important context for an assessment of the allegations. Simply put, Tomaskaan was particularly vulnerable at the time the alleged events here occurred and especially susceptible to the ISIS propaganda he was consuming.

In 2023, a head-to-head collision in a football game resulted in a concussion so severe that Tomaskaan was forced to medically retire from football. Losing football had immediate, serious effects on Tomaskaan's life. At that point, Tomaskaan's entire identity was wrapped up in being a high school football player. Having moved around a lot, and having lived for a time overseas, football was the only way he made friends when he first got to Montclair High School, his third high school in three years. In addition to the immediate impact of losing his friends, his team, and his sense of identity at school, overnight, he also lost all of his hope for his future. He was a serious football player with a real chance of playing college football and a realistic hope of getting a scholarship to college to do exactly that. But his medical retirement suddenly ended his lifelong dream of playing football in college.

Lost, Tomaskaan looked to the internet and religion to make sense of the world and find connection. He became socially isolated, spending hours reading about international politics online. He followed online rabbit holes to dark corners of the Internet, including a number of TikTok live group chats where users espoused extremist views and disseminated ISIS propaganda. He was troubled by images depicting the senseless killing of innocent women and children abroad and was drawn to narratives about safeguarding women and children—both common themes in ISIS's propaganda playbook. He wanted to feel strong and like a leader, as he had while playing football. And he wanted to feel like he was on a team again, bonded closely to others, with a shared sense of purpose. Many of the statements attributed to Tomaskaan in the Complaint are about the importance of developing a close-knit community. *See e.g.*, ¶ 28 (discussing desire to establish a

---

[3] Siegler, supra note 2, at 146.

Hon. Magistrate Judge Almonte
February 2, 2026
Page 8

community and be around many brothers); ¶ 32 (same); ¶ 41.

As stated at the outset, we appreciate that the allegations in the Complaint are serious, and so do Tomaskaan and his family. But, at the time of his arrest, he knew no one in ISIS, had never communicated with any actual ISIS member, knew no one who could supply weapons or smuggle people into ISIS-controlled territory, and had never committed a violent act against any person or animal. He had no actual plan other than to travel with his online friends – whom he had never met in real life – to Turkey (where he lived as a child, and has family) and build a community. Viewed in this factual context, many of the communications and claims quoted in the complaint appear to be the grandiose role-playing of a young man desperately searching for importance and belonging after a terrible concussion destroyed the dream he had spent his life chasing.

For example, when one of his online friends (actually an informant for the government, according to the Complaint) asks Tomaskaan where they will be going on their trip, Tomaskaan has no real answer. He instead speculates that the people they might someday join were somewhere "north of Jordan ... and like Southern Syria." Complaint, ¶ 57. *See also id*., at ¶ 66 ("I think we need to group up near Israel, like in Jordan . . . "). Tomaskaan boasted to his online friends about skills he does not have, claiming "expertise in physical fighting" (¶ 62) when he had only taken recreational jiu jitsu classes as a child, and claiming he could "help with weapons training" (¶ 61) when he had been to a shooting range only a few times. He bragged about connections he could never have made, like telling his friends he would connect them to weapons smugglers (¶ 74) and human smugglers (¶ 96), and access to weapons that he has never had nor could have, *see e.g.*, ¶ 127 (claiming he could "obtain RPGs," "explosive vests and grenades"). Even though these statements were not true, they are troubling. But the fact that many of the most inflammatory statements in the Complaint are not true is important context for the Court's assessment of the nature and circumstances of the offense conduct here.

Sadly, many of the chat excerpts in the Complaint show Tomaskaan dreaming of becoming famous, featuring in a Netflix show and having a Wikipedia page. *Id.* at ¶120. These are the misguided imaginings of a young man who once had importance and prestige through his prowess as a football player, then was isolated at home with a terrible concussion and went deep down an ideological rabbit hole, finding people who exploited his desire to be important and "save women and children."

Much of Tomaskaan's alleged behavior, understood in context, is consistent with the Supreme Court's observations of the vulnerability of the adolescent brain. In *Miller v. Alabama*, 567 U.S. 460, 569 (2012) the Court explained that teenagers "lack [] maturity," have an "underdeveloped sense of responsibility," "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure," and have personality traits that are "more transitory, less fixed." It is also consistent with the social science research focused on adolescents drawn to extremist ideology, which indicates that these are most commonly adolescent males who have become alienated from their community and family for a specific reason and look to religion online as a source of understanding and comfort. *See, e.g.,* G. Brounsard et al., "Adolescents Engaged in Radicalisation and Terrorism: A Dimensional and Categorical Assessment," Front. Psychiatry 2022 Jan 14; 12:774063.

Hon. Magistrate Judge Almonte
February 2, 2026
Page 9

There are myriad other ways that the Complaint itself illustrates Tomaskaan's immaturity and how infeasible his alleged plan was, which should inform the Court's assessment of his alleged conduct here. For example, according to the Complaint, after a group of people were arrested in the Eastern District of Michigan, Tomaskaan understood that law enforcement would imminently arrest him for his connection to them. Complaint, ¶ 208. What happened next illustrates Tomaskaan's unsophisticated and unrealistic thinking—the thinking of an adolescent brain, compromised by serious brain injuries. Believing that the FBI might have a warrant for his arrest, he booked a plane ticket under his *true* name and intended to travel with his actual passport. He made no effort to change or hide his appearance. He went to the airport many hours before he needed to be there for his flight, increasing rather than decreasing the time he would spend in a heavily policed location. And contrary to directives he allegedly gave in groupchats about attempting to avoid detection while traveling by, among other things, booking a ticket to a destination other than Turkey, *see* ¶ 115 ("JIMENEZ-GUZEL then instructed his co-conspirators . . . to buy plane tickets that did not have Istanbul as the final destination"), he bought a ticket straight to Istanbul. He waited at the airport and when the FBI arrived, he was cooperative and compliant.

### B.  The Weight of the Evidence

The defense has not yet received any discovery, so we do not have a full picture of the evidence against Tomaskaan. Based on the complaint, while again recognizing the seriousness of the allegations, there is also reason to question whether some of the communications are taken out of context and/or provoked by the government's informants. Relatedly, while the Complaint contains claims by Tomaskaan that he will be communicating with smugglers or people with access to weapons, the Complaint contains no claim that Tomaskaan ever actually did any of those things. Nor, again, does Tomaskaan seem to have any concrete plan of where to go or how to join an actual fighter group. Even the messages and texts in the Complaint are often characterized by a misguided Gen Z-style joking about serious topics, for example, saying military training will be necessary because "[s]ome of yall are gonna def shoot someone by accident . . . [b]ros gonna point his gun to my foot," (Complaint, ¶ 44).

### C.  The History and Characteristics of the Person

Tomaskaan Jimenez-Guzel is a 19-year-old U.S. citizen who was born in the United States and raised in Maryland, Istanbul, New York, and New Jersey. He is the son of Meral Guzel, who was born in Turkey and identifies as a secular Muslim, and Javier Jimenez-Mosquera, who was born in Ecuador and is a practicing Catholic. Tomaskaan is the youngest of three sons. All three brothers were baptized in the Catholic Church and raised in the Catholic faith. After his parents' divorce in 2014, Tomaskaan moved with his mother, who is a scholar and policy advisor to non-governmental organizations on international development issues, to live with his maternal family in Istanbul from 2015 to 2018 while his mother managed a special project for the UN on women's rights. His older brothers, who were already in high school, stayed in Maryland with their father, an international development lawyer. Tomaskaan and his mother returned to the United States in 2018. Tomaskaan attended the UN International School in Manhattan and then Xavier Jesuit

Hon. Magistrate Judge Almonte
February 2, 2026
Page 10

Academy in Manhattan until he and his mother moved, in 2022, to Montclair, New Jersey, and he transferred to Montclair High School.

Tomaskaan has always done well in school. He is a diligent and engaged student. Sports—especially tackle football—became his passion and his way to fit in socially in Montclair. The Montclair High School football team, for which he was the starting defensive end, was where he felt he truly belonged. He was receiving significant interest from Division I college programs, and football was central to his sense of purpose and community. He was working closely with Orlanda Burks, a renowned consultant who works with talented high school athletes to develop the organization, responsibility and integrity necessary to succeed in college. Mr. Burks describes Tomaskaan as the best of the nearly 400 adolescents he has worked with over the last fifteen years, because of Tomaskaan's responsiveness to direction and commitment to the program they developed together. For nearly two years, Tomaskaan spent hours each day either at practice or working out at the gym, carefully watching his nutrition and caring for his health. That trajectory was abruptly interrupted in the summer and fall of 2023, when Tomaskaan suffered a number of serious sports injuries, including a significant knee injury and serious concussion from a head-to-head collision. For months, he recovered at home, frequently suffering serious migraines from his head injury. He no longer had a community or a plan for his future and he felt worthless. He withdrew from Mr. Burks, from his school friends and from his family. Despite this, he graduated from Montclair High School with a 3.8 GPA in June 2025. He spent much of the summer of 2025 in Turkey, staying with his grandparents in a seaside village, working out alone without weights or a gym, and, unbeknownst to his family, getting enmeshed in online chat groups and radical propaganda. He converted to Islam, much to the dismay of his Catholic father and secular mother. He started college at Rowan University in September 2025.

Tomaskaan still suffers from frequent and severe migraines—a consequence of the series of concussions he sustained between 2020 and 2025, including, most recently, during a fall in the jail. His migraines worsened markedly beginning in 2025 and include pain, light and sound sensitivity, weakness, neck stiffness, vertigo and tinnitus, making it hard at times for him to leave the house and leading to depression, anxiety, and isolation. They last anywhere from two days to weeks and occur several times a month. Although he was prescribed topiramate, an anticonvulsant medication primarily used to prevent migraine headaches, the migraines persisted. From September 2024 to April 2025, a six-month period, Tomaskaan missed almost four weeks of school due to migraine pain. The migraines were so disruptive to Tomaskaan's daily life that he sought medical attention under the care of Dr. Nabeen Hussain—a neurologist in Maryland.

In the summer of 2025, Dr. Hussain treated Tomaskaan's persistent migraines by enrolling him in a trial of Aimovig—a self-administered, monthly injection used to prevent migraines in adults. He also performed a neurological evaluation that revealed Tomaskaan suffers from "objective [cognitive] impairment" and "functional impairment," and he recommended further testing to evaluate whether major neurocognitive disorders were present. Further testing could not be performed before Tomaskaan's arrest on November 4, 2025.

For the past three months, Tomaskaan has been detained at Essex, and for the entire duration of this time, has been held in the SHU. Confined to his small cell by himself for twenty-two hours a day, Tomaskaan is subject to conditions that exacerbate his underlying conditions—

Hon. Magistrate Judge Almonte
February 2, 2026
Page 11

loud, persistent noises, glaring light, minimal mental or physical stimulation, and hardly any human contact. Indeed, his physical and mental health have severely deteriorated.

Tomaskaan's average day includes sudden and blaring alarms that sound for sometimes hours on end. More distressing are the screams and cries of other incarcerated individuals placed in the SHU, who have been sent there as punishment for misbehaving or who suffer from serious mental health issues. Unable to escape the constant barrage of noise, Tomaskaan wakes with a migraine nearly every morning. His condition is worsened by the bright fluorescent light in the center of his room—on at full brightness for eighteen hours a day. During the January 24–26, 2026 snowstorm, Tomaskaan was confined to his flooding cell for 84 consecutive hours, without any heat.[4]

Records from Essex show that since arriving at Essex, Tomaskaan has requested medical treatment for his migraines over a dozen times, sometimes being seen days or weeks after requests are made, and sometimes not at all. Initially, Tomaskaan was prescribed three tabs of 200 MG ibuprofen, but unsurprisingly, his symptoms persisted. In response to nearly three months of complaints that he is experiencing persistent and severe migraines and the treatment prescribed was ineffective, on December 30, 2025, Essex's Medical Department prescribed him imetoprolol—a beta blocker often used to treat high blood pressure. But this too, is insufficient to relieve Tomaskaan of his severe and constant migraine pain. Tomaskaan's physical health has worsened in other, related ways. The toll of ineffective treatment is substantial. Tomaskaan has reported that due to his headaches, he is experiencing heightened anxiety. He has also reported being depressed, claustrophobic, and losing weight.

Tomaskaan's history of traumatic brain injuries not only results in severe and persistent migraines that are worsened by conditions inherent to a carceral space, the conditions of Tomaskaan's confinement will almost certainly result in irreparable psychological damage, given his age. In addition to long-term isolation, Tomaskaan cannot participate in any programming, whatsoever. These aspects of Tomaskaan's custody are perhaps most concerning, as they will likely continue his documented history of cognitive decline.

Tomaskaan's young age exacerbates these concerns. It bears emphasizing that Tomaskaan is still a teenager—only nineteen years old. As the Supreme Court and the Sentencing Guidelines have acknowledged, brain development is far from complete in teenagers. *See, e.g., See, e.g., Roper v. Simmons,* 543 U.S. 551 (2005)*; Atkins v. Virginia,* 536 U.S. 304 (2002); U.S.S.G. § 5H1.1 ("youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood."). In fact, the operative scientific consensus is that adolescence is a particularly important period of morphological and functional changes in the brain. *See* L. SPEAR, THE BEHAVIORAL NEUROSCIENCE OF

---

[4] During the period for which the jail was not heated, Tomaskaan only had a cotton t-shirt, a cotton long-sleeved shirt, a thin hoodie and a single blanket. Notably, at this time, temperatures in Newark, New Jersey, where Essex is located, ranged from seven to twenty-nine degrees Fahrenheit. On the third day, when the heat was turned back on, the jail offered Tomaskaan an additional blanket.

Hon. Magistrate Judge Almonte
February 2, 2026
Page 12

ADOLESCENCE 303 (2010). The human brain undergoes "significant [behavioral and cognitive] changes" after the age of eighteen.[5] More specifically, it experiences important prefrontal cortex development, myelination, and synaptic pruning. These changes help fully formed adults exercise greater cognitive control and executive functioning.

But trauma slows brain development in emerging adults and predisposes them to acting impulsively. While typical 19-year-olds still have years of brain development ahead of them, those who experience stress and trauma can be even further away from full cognitive maturity. Fortunately, the adolescent brain is also far easier to redirect and treat with psychological counseling and guidance. Indeed, data on adolescent criminal behavior consistently shows that young people are most amenable to deradicalization programs and other interventions. John Horgan, *What makes a Terrorist Stop Being a Terrorist?,* J. for De-radicalization 1, 2 (2014); Mubin Shaikh, *Countering Violent Extremism Online: An Anecdotal Case Study Related to Engaging ISIS Members and Sympathizers on Twitter,* 98 Soundings 478, 485-86 (2015). *See also United States v. Singh*, 877 F.3d 107 (2d Cir. 2017) (prior crimes were "committed by Singh when he was only 21 or 22 years old" warranted leniency in light of "a juvenile nonhomicide offender's capacity for change and limited moral culpability" *Id.* at 117 n.5 (quoting *Graham*, 560 U.S. at 74)).

Should Tomaskaan be released on bail, he will have the benefit of the Parents for Peace Program, aimed at compassionate de-radicalization and led by experienced counselors.

### D.  Nature and Seriousness of the Danger to the Community

Under the Bail Reform Act, the conditions of release do not need to guarantee, but rather "reasonably assure" the safety of the community. *See United States v. Tomero*, 169 F. App'x 639, 641 (2d Cir. 2006) (reiterating that 18 U.S.C. § 3142(e) requires "a reasonable assurance rather than a guarantee" of community safety); *see also United States v. Farris*, 08-CR-145 (DSC), 2008 WL 1944131, *11 (May 1, 2008 W.D.Pa.) ("no "more than an 'objectively reasonable assurance of community safety' " is to be demanded.) (internal quotation and citation omitted); *United States v. Schwamborn*, No. 06-CR-0328, 2007 WL 9653331, at *8 (E.D.N.Y. June 29, 2007) ("[T]he Bail Reform Act requires a reasonable assurance, not a guarantee, of safety.").

---

[5] *See* Melissa S Caulum, *Postadolescent Brain Development: A Disconnect between Neuroscience, Emerging Adults, and the Corrections* System, 3 WISC. L. REV. 729, 732 (2007) (explaining that the brain continues to develop through the mid-20s: "a legal system that arbitrarily distinguishes between juveniles and adults based on the age of eighteen cannot be reconciled with the psychological, behavioral, and cognitive research that shows significant development through the age of twenty-five."); *see also* Alison S. Burke, *Under Construction: Brain Formation, Culpability, and the Criminal Justice System*, 34 INT'L. J. OF L. & PSYCH. 381, 383 (2011) ("The development of the brain is associated with improved judgments, impulses, memory, problem-solving capabilities, emotions, consideration of alternatives and consequences, and every other facet associated with the frontal lobe.").

Hon. Magistrate Judge Almonte
February 2, 2026
Page 13

To detain a defendant based on danger to the community, the government's proof must be clear and convincing. 18 U.S.C.§ 3142(f)(2)(B). To find danger to the community under that standard of proof "requires that the evidence support such a conclusion with a high degree of certainty." *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985). Even where there is a presumption of detention, "the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community." *See United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). In analyzing whether it has been established by clear and convincing evidence that the safety of the community cannot be reasonably assured upon the defendant's release, the entire record and the availability and potential effect of any restrictive conditions are to be taken into account. *See Farris*, 2008 WL 1944131, at *10 (citing *United States v. Patriarca,* 948 F.2d 798, 791 (1st Cir.1991) (Where government has proven the defendant's release will present a risk of flight and/or safety to the community, including by operation of a statutory presumption, the court is to "proceed to evaluate the conditions to see if they will serve as a reasonable guard." ).

If the government satisfies that burden, the court must still determine whether there are conditions that will reasonably assure the safety of the community if the defendant is released. *See United States v. Khashoggi,* 717 F. Supp. 1048, 1049 (S.D.N.Y. 1989); *see also United States v. Paulino*, 335 F. Supp. 3d 600, 603 (S.D.N.Y. 2018) ("[T]he government must prove . . . not only a defendant's potential danger to the community, but also that no conditions can reasonably assure the safety of any other person and the community.").

Whatever danger Tomaskaan may have posed if he had made it further than his family's home in Turkey, to Syria, and in fact been able to find and be accepted into an ISIS fighter group (which does not, at least according to the Complaint, seem plausible), he poses no danger to anyone in the United States. He has no criminal history, he has never committed a violent act against any person, his only "fight" training is in childhood jujitsu classes, he has been to a legal shooting range a handful of times, mostly with his father and older brother, and he will have no access to weapons. Moreover, he will have intensive support from his family, his counsel, his mentor and Parents for Peace. Any danger that his interest in radical ideology presents will be best countered, and as soon as possible, by engaged counseling by knowledgeable people. Such counseling is not available in a carceral setting.

In *Mattis*, which involved two defendants charged with having fire-bombed a police car, the Second Circuit recently observed:

The government's position that the district court committed clear error in granting bail essentially boils down to an argument that the charged criminal conduct is so extreme and aberrant that it represents the new normal for the defendants, such that no set of conditions could reasonably assure the safety of the community. The acts alleged were indisputably dangerous and may have posed a serious risk to individuals in the surrounding areas. As a threshold matter, however, we must observe that the entire system for determining bail is premised on the belief that, at least to some extent, all criminal acts are aberrant. The very reason that Congress directed district courts to consider factors beyond just the severity of the offense is

Hon. Magistrate Judge Almonte
February 2, 2026
Page 14

the recognition that an individual is more than the crime of which that individual has been accused.

963 F.3d at 293. Here, the only factor indicating danger is the charges against Tomaskaan. If the accusations in the Complaint alone were deemed sufficient to warrant detention, this would improperly require the detention of any defendant accused of providing material support or similarly serious charges. *Cf. United States v. Cirillo*, 149 F. App'x 40, 43 (2d Cir. 2005) (noting that even for organized crime leaders, there is "no per se rule requiring . . . detention"). This is plainly at odds with the Bail Reform Act and current practice showing that defendants accused of material support and related crimes can be released on bail and comply with their conditions of supervision, including in the following representative cases:

In *United States v. Kyse Abushanab*, 25 Cr. 137 (KSH) (D.N.J.), with the consent of the government, Judge Hayden released a defendant charged with providing material support to ISIS on a $100,000 unsecured bond. Mr. Abushanab was alleged to have used encrypted messaging platforms to gather and distribute training materials on the making and use of explosives to ISIS supporters. Mr. Abushanab has remained on release, even following his guilty plea, without incident.

In *United States v. Halimi Salman*, 24 Cr. 206 (NCM) (E.D.N.Y.), over strong opposition from the government, Judge Natasha C. Merle reversed the detention order imposed by the Magistrate Judge and released Ms. Salman, who was alleged to have received military-style training in Syria from ISIS, in violation of 18 U.S.C. § 2339D, from custody to home incarceration enforced by a $500,000 personal recognizance bond co-signed by eleven suretors (only one of whom was financially responsible), secured by a home with $141,000 in collateral, and with similar special conditions to those proposed in this case, including third-party custodians and working with Parents for Peace. Ms. Salman, who was taken to ISIS-controlled territory by her father when she was a minor, married an ISIS-fighter and allegedly underwent military training in how to fire an AK-47.

In *United States v. Hashimi et al.*, 22 Cr. 553 (ENV) (E.D.N.Y.), the defendants were charged with conspiracy to provide material support to a foreign terrorist organization, attempted material support, and money laundering, in violation of 18 U.S.C. § 2339B and § 1956(h). The defendants were accused of attempting to send tens of thousands of dollars to ISIS, using encrypted chats and cryptocurrency to avoid detection, consuming and disseminating ISIS propaganda, expressing support for violent acts of terrorism, and, in the case of two of the defendants, planning to visit an accused terrorist at Rikers Island. At the initial appearance, Chief Magistrate Judge Pollak released defendant Seema Rahman on a $500,000 bond with two suretors, secured by two real properties, and denied release as to defendant Abdullah At Taqi. Mr. At Taqi renewed his bail application before Magistrate Judge Merkl, which was again denied. Mr. At Taqi appealed the decision of the magistrate judge and on April 28, 2023, Judge Vitaliano granted the application over the government's objection. The two released defendants have not had any compliance issues. Mr. At Taqi was recently convicted of all counts after trial and continued on bail pending sentencing.

Hon. Magistrate Judge Almonte
February 2, 2026
Page 15

In *United States v. Shahidul Gaffar and Nabila Khan,* 20 Cr. 392 (JDW) (E.D. Pa.), a husband and wife were charged with providing material support to ISIS by sending money to relatives to permit them to join ISIS in Syria. They were released by Judge Wolson on unsecured $100,000 bonds to home confinement with electronic monitoring. They remained out on bail pending sentencing without issues.

In *United States v. Colin Mattis and Urooj Rahman*, 20 Cr. 203 (BMC) (E.D.N.Y.), two young lawyers were caught on video firebombing a police car during a Black Lives Matter protest. They were charged with arson and the use of explosives, charges which carried a 30-year mandatory minimum sentence. The government argued that their actions showed that they posed a danger to the community that no conditions of release could ameliorate. The Magistrate Judge, affirmed by the District Court and ultimately the Court of Appeals, found that the danger posed by their conduct, while extremely serious, did not mean that the presumption could not be rebutted, given their lack of any history of violence, no criminal record, strong family ties and public service careers. Both defendants were on pretrial release for nearly two years with no violations.

In *United States v. Delowar Hossain*, 19 Cr. 606 (SHS) (S.D.N.Y.), Judge Sidney H. Stein released Mr. Hossain from custody to home incarceration enforced by a $250,000 personal recognizance bond co-signed by five financially responsible persons. Mr. Hossain was accused of attempting to provide material support for an act of terrorism (the attempted murder of U.S. nationals overseas) in violation of 18 U.S.C. § 2339A and attempting to provide material support to a specially designated global terrorist organization in violation of the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1705(a). Specifically, the government accused Mr. Hossain of trying to recruit several young men into a scheme to travel to Afghanistan and join the Taliban. Mr. Hossain initially discussed attacking a particular army recruiting office in the Bronx on behalf of Al Qaeda. Later, he resolved to move to Afghanistan to fight against Americans. Over several months, Mr. Hossain prepared for the trip by declaring himself the "emir" (leader) of his group, and buying various items to use on the journey and give to the Taliban. The items included walkie-talkies, camping gear, hatchets, tents, and other outdoor materials to help the group navigate the tough Afghan terrain. Hossain also saved $10,000 to purchase weapons, and was in contact with actual Taliban members. Hossain took various steps to hide his plans from authorities, including requiring that his group meet in person, which forced the FBI to hide microphones on the confidential sources to obtain the communications. Mr. Hossain was ultimately arrested at the airport before he could board a flight to Thailand, the first stop on his trip to join the Taliban. Mr. Hossain faced a maximum punishment of 35 years' imprisonment and sentencing guidelines at the statutory maximum. Over the government's objections, Judge Stein released Mr. Hossain to home incarceration. Judge Stein found that the government had not met its burden as to dangerousness given Hossain's lack of a criminal record and because his alleged conduct (like that of Mr. Jimenez-Guzel) was focused entirely overseas. Judge Stein further rejected the government's argument that Hossain posed an insurmountable risk of flight given the personal recognizance bond and the five cosigners who were also sworn to the bond. Mr. Hossain remained on bail for nearly 16 months without a single violation, and was remanded following a guilty verdict at trial.

In *United States v. Kim Anh Vo*, 19 Cr. 223 (NRB) (S.D.N.Y.), Judge Naomi R. Buchwald released the defendant on a consent bail package, the conditions of which included participation

Hon. Magistrate Judge Almonte
February 2, 2026
Page 16

in a program aimed at countering extremism. Ms. Vo was charged with conspiring to provide material support to ISIS in violation of 18 U.S.C. § 2339B. Specifically, Vo worked as a member of the United Cyber Caliphate ("UCC"), which was committed to carrying out online attacks and cyber intrusions against Americans on behalf of ISIS, and recruiting others to expand UCC's capabilities. Vo attempted to disseminate violent ISIS propaganda threatening that "there will be blood today, tomorrow, and until your last breath" and recruited at least one minor to create content for the UCC, including a video and related posts of death threats targeting a nonprofit organization (dedicated to combating online extremism) in Manhattan as well as its leader. The threatening posts contained photographs of the CEO of the organization (a former U.S. ambassador) along with a video of an individual in shackles with his throat slit and bleeding. Vo pledged allegiance to Abu Bakr Al-Baghdadi, then the leader of ISIS. After the March 2017 terrorist attack outside the British Parliament building in London, Vo discussed using the success of the attack in creating new ISIS messaging and propaganda. On April 2, 2017, UCC posted online a kill list containing the names and personal identifying information of over 8,000 individuals along with a threatening video, promising to wage war, and a second video depicting a beheading. Ms. Vo continued her efforts on behalf of UCC and ISIS even after learning she was under FBI scrutiny. Ms. Vo ultimately pled guilty to the lesser offense of conspiring to provide material support, in violation of 18 U.S.C. § 371, with a five-year statutory maximum sentence. She was sentenced to time served.

Release on bail when very serious crimes are alleged is not limited to the terrorism context, of course. *See e.g., Paulino*, 335 F. Supp. 3d 600 (ordering release of alleged gang member with criminal history accused of a participating in a violent assault where there was video of him assaulting the victim); *United States v. Messina*, 11-CR-031 (E.D.N.Y.) (KAM), Minute Entry Mar. 3, 2011 (affirming magistrate judge's order releasing alleged organized crime associate accused of murder, extortion, and racketeering); *Farris*, 2008 WL 1944131 (denying government appeal of bail order releasing defendant charged with enticing a prepubescent child to meet in a hotel room for sex); *United States v. Polito*, 02-CR-047 (E.D.N.Y.) (DGT), Dkt. 23 (ordering release of alleged organized crime associate charged with three counts of murder in aid of racketeering and facing the death penalty).

The letters of support written by Tomaskaan's family and family friends vividly describe the strength of his relationship to his family, the shock his family has suffered at his arrest and the allegations, and their ability, with this new knowledge, to supervise him closely. *See* Exhibit C. The family's neighbor in Montclair for the last four years describes Tomaskaan's empathy and concern for others: "TK's face in particular would light up whenever he saw my boys. I could see his shell unfold as he made funny faces, picked them up, and made them laugh. He was so comfortable around my two little boys showing his vulnerability and his comfort with my … sons." Even knowing the allegations and having read the media stories, his neighbor writes that she would still trust Tomaskaan with her sons. *See* Exhibit C. Relatives and close friends write to the Court about the strength of character of both parents and their commitment to their teenage son. *Id.* Any risk of danger here can be mitigated with the proposed strenuous conditions. "Doubts whether [bail] should be granted or denied should always be resolved in favor of the defendant." *Herzog v. United States*, 75 S. Ct. 349, 351 (1955); *accord United States v. Williams*, No. 17-CR-78-FPG, 2018 WL 3633296, at *2 (W.D.N.Y. July 31, 2018).

Hon. Magistrate Judge Almonte
February 2, 2026
Page 17

### E.  Any Risk of Flight Can Be Ameliorated With Conditions

A finding of risk of flight must be supported by a preponderance of the evidence. *See United States v. Himler,* 797 F.2d 156, 161 (3d Cir. 1986). Tomaskaan, despite being arrested at the airport, poses a low risk of flight, which can be fully ameliorated with the proposed conditions. He has neither the means nor desire to flee the instant prosecution. His life is here in the United States. He is extremely close to his family. He will be subject to electronic monitoring and not able to go anywhere without Pretrial Services knowing. His passports have been seized by the FBI. And, his parents will not let him go anywhere or do anything foolish if he is released on bond. The allegations against Tomaskaan have shaken the entire family to their core. The harsh conditions of Tomaskaan's confinement – particularly shocking to a family unfamiliar with the criminal justice system -- have reinforced the seriousness of his situation even more. His gratitude and loyalty to the friends and family who are willing to help him at the lowest point in his life will stop him from doing anything to create further financial or emotional distress for his support system.

### F.  Conclusion

In sum, the government cannot carry its high burden of proving by clear and convincing evidence that there are no release conditions that will reasonably assure the safety of the community. The government also cannot prove by a preponderance of the evidence that there are no conditions that would reasonably assure Tomaskaan's appearance in court. He should not be detained.

Hon. Magistrate Judge Almonte
February 2, 2026
Page 18

                                           Respectfully submitted,

                                           */s/*
                                           Deirdre von Dornum
                                           Alexandra Conlon
                                           Krista Staropoli

                                           *Attorneys for Tomaskaan*
                                           *Jimenez-Guzel*


cc:      All counsel (by ECF)
         U.S. Pretrial Services (by E-Mail)